**UNITED STATES**

**v.**

**Technical Sergeant George F. KIMBLE, FR 490–60–1041, United States Air Force.**

**ACM 27680.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 28 Jan. 1989.

Decided 25 April 1990.

---

**3.** *See United States v. Foy,* 30 M.J. 664 (A.F.C.M. R.1990) for suggested procedures to avoid this recurring problem.

Appellate Counsel for the Appellant: Colonel Richard F. O'Hair and Captain Bernard E. Doyle, Jr.

Appellate Counsel for the United States: Colonel Joe R. Lamport; Colonel Robert E. Giovagnoni; Major Terry M. Petrie; Captain Morris D. Davis and Captain Bruce S. Ambrose, USAFR.

Before BLOMMERS, KASTL and MURDOCK, Appellate Military Judges.

## DECISION

KASTL, Senior Judge:

Under the Confrontation Clause, how far must the Government go to secure the presence of a witness before he or she can be considered "unavailable?" Such is the question before us today. Like the recent case of *United States v. Ferdinand,* 29 M.J. 164 (C.M.A.1989), we find that the Government did not go far enough to aggressively subpoena a necessary witness. At the same time—as in *Ferdinand*—we are convinced that admission of hearsay statements of the absent witness was harmless beyond a reasonable doubt. We will address this issue and others. We affirm.

### *Factual Setting*

Despite pleas of not guilty, the appellant was convicted of indecent acts upon AK, a child under 16, by touching her private parts and fondling her with the intent to arouse his sexual desires, in violation of Article 134, UCMJ, 10 U.S.C. § 934. He was sentenced by members to confinement for four years and reduction to airman first class.

It was 15 June 1988 in Nevada. Mrs. Patricia Shaw, a neighbor and close friend of the appellant's family, received a late evening phone call from the appellant's older daughter, SK. During the conversation, SK reported that "our daddy's doing it

again;" in the background, Mrs. Shaw could hear AK, the alleged victim, stating "no, no, please don't tell her." Mrs. Shaw succeeded in getting AK to the telephone. Mrs. Shaw had suspected the appellant of prior indecent acts with his daughter in April 1987. Now, she went to the appellant's house; finding the parents gone, she took AK to her own house, then went searching for the appellant and his wife.

While Mrs. Shaw did not go into details with AK, she did ask what the appellant had done. AK replied that he had caressed her breasts and her privates; she also related that "around Christmas it started again," and was continuing. AK also indicated that touchings had occurred earlier the very same day.

Mrs. Shaw located the parents at a local casino and informed Mrs. Kimble of AK's allegations. Mrs. Kimble apparently contacted both civilian authorities and the appellant's reporting official, Chief Master Sergeant Wilson. Informed of the problem, Chief Wilson believed the alleged misconduct was restricted to one or two occasions. Chief Wilson briefed the appellant's superior, Major Trent. They initially felt civilian authorities should handle the case. Wilson, a close friend of appellant, went to his house, spoke briefly with Mrs. Kimble, and took the appellant home. The appellant lived with Wilson over the next two months.

Meanwhile, the appellant was dealing with civilian authorities concerning the matter. He gave no statement to the authorities. Through a private attorney, he was able to arrange for a deferral of prosecution upon successful completion of a counseling program. On the military side, Major Trent arranged for the appellant to be evaluated at government expense by Dr. Masters, a psychiatrist, in regard to the appellant's security clearance.

Major Trent and the on-site commander, Colonel Jones, received informal notification of the state decision not to prosecute. They continued to defer to the civilian community handling all aspects of the case and advised the appellant that if he successfully completed a program of therapy, he would not face a court-martial. They apparently believed there were only two incidents involving the appellant and AK.

Pursuant to his agreement with the state, the appellant entered a sexual abuse treatment program; in July 1988, he began seeing Mr. Daniel Bixler, a clinical therapist, as part of that regimen. In his sessions with Mr. Bixler, the appellant admitted to performing indecent acts upon AK in April 1987 and on numerous occasions between January and June 1988. This detailed information was unknown to the appellant's supervisors at that time; they apparently only learned of the full details in August 1988.

In August 1988, Colonel Jones retired and was succeeded by Colonel Tilley. Shortly thereafter, the appellant was advised by Chief Wilson that an agent of the Office of Special Investigations (OSI) wished to interview him. Chief Wilson counselled the appellant to cooperate and opined that he need not fear the interview—it was merely for informational purposes. After Article 31 10 U.S.C. § 831 advisement, the appellant provided a full confession to the OSI. (His statement was not offered at trial because the appellant's defense counsel had not been notified of the interview).

After reading the OSI report, Major Trent and Colonel Tilley decided to prefer charges against the appellant because his offenses were much more extensive than they had thought. Trent and the retiring Colonel Jones apparently had believed the appellant had committed *two* indecent acts, not multiple offenses over an extended period. However, as appellate defense counsel point out, the appellant was forthright with Nevada health care professionals from the outset as to the extent of his involvement.

As for AK, she had begun seeing a family therapist, Ms. Evelyn Hall. AK told Ms. Hall that the appellant had touched her private parts in April 1987, stopped for awhile, then started again around Christmas 1987 and continued until mid-June 1988. AK and her mother saw Ms. Hall for 11 sessions. The defense insists that AK

and Mrs. Kimble did not desire therapy but were virtually coerced to seek therapy by Nevada authorities upon threat to remove AK from the home. During the appellant's court-martial, Ms. Hall testified that after the second session, AK refused to acknowledge that a problem existed, claiming that everything was fine and she did not need further treatment.

### A De Facto Grant of Immunity?

■ Citing *Cooke v. Orser*, 12 M.J. 335 (C.M.A.1982), the appellant first asserts that he was denied due process under the Fifth Amendment in that he enjoys the functional equivalent of a grant of immunity. To the defense, the appellant and his family had worked with Nevada authorities solely due to assurances from the appellant's commander and the Air Force that no punitive military action would occur—providing he cooperated. Then, says the defense, the prosecution built the case upon at least two unlawfully induced statements: (a) the appellant's revelations to Mr. Bixler as part of state-supervised therapy in lieu of trial; and (b) those made by AK to Ms. Hall during her therapy. Clearly, says the defense, the bulk of the Government's case against the appellant came precisely because of his cooperation. In effect, the Government snookered the appellant; therefore, good faith and minimal integrity require an ungrudging enforcement of this *de facto* grant of immunity. *See United States v. Spence*, 29 M.J. 630, 637 (A.F.C. M.R.1989) and cases cited.

We are stubborn and unyielding in our determination to enforce the Rule of Law. As we indicated in *Spence*, if the Air Force effectively promises an individual that he will not be prosecuted, we will enforce that promise; "the Air Force cannot break its word." *Spence*, 29 M.J. at 637.[1] Here, however, the situation is far different, and we find that the appellant's rights were not violated. It is also of some significance

that the United States was not a party to any agreement between the appellant and Nevada authorities. However, far more germane to our holding is the fact that the appellant did not deal forthrightly with the Government. The Air Force, prior to August 1988, lacked crucial facts about the appellant's sexual conduct with his daughter. It follows that Air Force officials never made a *knowledgeable* election to forego prosecution. The military judge's extensive findings of fact on this matter accurately portray what occurred. We will not disturb them. *United States v. Middleton*, 10 M.J. 123, 133 (C.M.A.1981).[2]

### Hearsay Statements

The appellant mounts a dual objection based on hearsay. He argues that the statements of AK to both Ms. Hall and Mrs. Shaw were inadmissible and that the military judge erred in admitting them.

■ We find the statements to Mrs. Shaw clearly admissible under Mil.R.Evid. 803(2). *United States v. Arnold*, 25 M.J. 129 (C.M.A.1987); *United States v. Urbina*, 14 M.J. 962 (A.C.M.R.1982).

The statement made by AK to Ms. Hall is a closer matter. In *United States v. Williamson*, 26 M.J. 115, 118 (C.M.A.1988), the Court of Military Appeals pointed out that the "medical history" exception under Mil.R.Evid. 803(4) requires two preconditions: (a) the statement must be made for purposes of medical diagnosis or treatment; and (b) the person must make the statement with some expectation of receiving medical benefits from the diagnosis or treatment. Here, the appellant insists that by Ms. Hall's own testimony, AK was angry and reluctant to talk. She never conceded she had a problem, and—at least initially—attended sessions because of pressure from Nevada welfare authorities.

1. We find apposite a telling philosophic comment on judicial integrity: "Let the judges also remember that Solomon's throne was supported by lions on both sides: let them be lions, but yet lions under the throne." Essays: Of Judicature, *The Works of Francis Bacon* (1852) pp. 58–59.

2. The appellant's reliance on AFR 111-1, *Military Justice Guide,* paragraph 3–7 (30 September 1988), is misplaced. That guidance involves Air Force prosecution after *trial* in a state court. *See United States v. Taylor*, 16 M.J. 882, 884 (A.F.C.M.R.1983) and cases cited.

Contrariwise, the Government points out that after initial contact, AK and her mother voluntarily contacted Ms. Hall. AK (in the opinion of Ms. Hall) was taking some of Ms. Hall's suggestions to heart.

We find the issue extremely close. *See United States v. Avila,* 27 M.J. 62 (C.M.A. 1988); *see also Morgan v. Foretich,* 846 F.2d 941 (4th Cir.1988) (child abuse victim's statements to treating psychologist necessary for treatment; admissible even though doctor was consulted for purposes of trial and not for treatment) and Saltzburg, Schinasi & Schlueter, *Military Rules of Evidence Manual* (2d Ed.1986) pp. 642–643. Taking the matter in the light most favorable to the appellant, we will assume, *arguendo,* that the statements to Ms. Hall were inadmissible. We will not consider them in any way in our ultimate resolution of this case.

### The Government's Duty to Produce Witnesses

▮ In the present case, the Government argues that it took all necessary affirmative measures to compel the testimony of the appellant's wife and AK at his court-martial. Mrs. Kimble had moved to her father's home in Missouri with her children at some time prior to the court-martial.

Several weeks before trial, both OSI and the assistant trial counsel succeeded in contacting Mrs. Kimble on the telephone. During their conversations, she stated that neither she nor the children would appear as witnesses. She indicated she would disobey a subpoena to appear.

A few days prior to trial, an OSI agent sought to serve subpoenas on Mrs. Kimble and the children in Missouri. He was met at the entrance to the property by a man stating he was Mrs. Kimble's father. He related that Mrs. Kimble was not at home and had gone to another state. The man would not permit the agent to enter.

The next day, the agent returned with local deputy sheriff assistance. Essentially, the same thing happened. The Government made no further attempts to serve Mrs. Kimble.

While this case was being presented to us, the Court of Military Appeals issued *United States v. Ferdinand,* 29 M.J. 164 (C.M.A.1989). In that case, the defense objected to admitting a transcript of a videotaped interview between a child victim and investigators on the ground that the Government had failed to show the child was unavailable as a witness. As part of the prosecution's proffer, it was shown that the accused's wife took the child from their residence to another state; that the wife was personally served there with a subpoena for herself and a subpoena *duces tecum* ordering her to bring her daughter; and that the wife refused. The military judge found that any attempt to force the wife to produce the child to testify would be a "futile gesture," and he ruled the child unavailable.

On appeal, the Court was unconvinced that the child was "unavailable" within the meaning of Mil.R.Evid. 804(b)(5). The Government must adequately demonstrate the declarant's unavailability, the Court cautioned, citing recent Supreme Court authority: If there is a possibility—albeit remote—that affirmative measures might produce the declarant, the obligation of good faith might demand such production. The lengths to which the prosecution must go would be measured by the standard of reasonableness. The Court insisted that the affirmative measures the Supreme Court mentioned "do not end simply with service of a subpoena;" furthermore, the military judge hardly went far enough when he yielded in the face of a mother's threat to disobey a yet-unissued order. *Ferdinand,* 29 M.J. at 164.

Despite all this, the Court was able to sustain the conviction in *Ferdinand* on the basis that the appellant had both confessed and made separate admissions to his wife about molesting his daughter; in addition, an Air Force nurse gave corroborating physical evidence, having examined the child.

We specified to appellate counsel the possible pertinence of *Ferdinand* and requested briefs to aid us. Having considered *Ferdinand* and those briefs—as well as the more-recent case of *United States v.*

*Davis,* 29 M.J. 357 (C.M.A.1990)—we are convinced that this case is heavily impacted by the logic of *Ferdinand.*[3]

Here, appellate defense counsel argue that nothing the Government did in this case was sufficient to meet the parameters of *Ferdinand.* The defense masses three factors to buttress that assertion. First, the assistant trial counsel indicated that she believed Mrs. Kimble was living at her father's residence; yet there is no indication the Government pursued that lead by checking with neighbors, following up on a telegram supposedly sent by Mrs. Kimble, or seeking to serve AK *directly* (she may have been enrolled in school in Missouri, the defense suggests). Second, the Government waited until the eleventh hour to do anything, then abandoned efforts at the first sign of reluctance from Mrs. Kimble's father. Third, the Government's tentative actions "never required Mrs. Kimble to make a decision to disobey a legal summons," and the military judge never exercised his considerable powers to compel their attendance.

The defense argument is a powerful one. However, on balance, we believe the able appellate Government brief on the specified issue furnishes the key to resolving this matter. The Government insists that there is a crucial distinction between "classic" hearsay admitted under Mil.R.Evid. 803(1) through (23) and residual hearsay admitted under Mil.R.Evid. 803(24) or 804(b)(5). This distinction, says the Government, goes to the very heart of the issue here. As the Court of Military Appeals noted in *United States v. Hines,* 23 M.J. 125, 128 (C.M.A. 1986), the Supreme Court has not required production or proof of unavailability of declarants "of those types of hearsay statements that have classically been admitted without regard to the declarant's availability, *e.g., excited utterances,* business

records, learned treatises, etc." (Emphasis added).

█ We find this argument persuasive. There is no requirement for proof of unavailability of the declarant for an excited utterance. *Hines,* 23 M.J. at 128 n. 6. Cases cited by the appellant deal with statements admitted under non-traditional or residual types of hearsay.

█ Applying this analysis to the instant case, we find that the statement of the appellant to the civilian psychologist conceding his indecent acts with AK, corroborated by the excited utterances of AK to Mrs. Shaw, are sufficient to sustain the conviction against him. As noted above, we will assume, *arguendo,* that the statements of AK to Ms. Hall were inadmissible because they were not given for the well-being or treatment of AK. Nonetheless, upon close examination of the record, we are convinced the admission at the trial level of those statements to Ms. Hall at worst constituted an error harmless beyond reasonable doubt. *See United States v. Remai,* 19 M.J. 229 (C.M.A.1985).

We are convinced that the clemency matters submitted by the appellant were considered by the convening authority before he took action in this case. *United States v. Craig,* 28 M.J. 321 (C.M.A.1989); *United States v. Blanch,* 29 M.J. 672 (A.F.C.M.R. 1989).[4]

The findings of guilty and the sentence are correct in law and fact and, on the basis of the entire record, are

AFFIRMED.

Senior Judge BLOMMERS and Judge MURDOCK concur.

---

3. Because the Court of Military Appeals ultimately affirmed the conviction in *United States v. Ferdinand,* 29 M.J. 164, 168 n. 7 (C.M.A.1989), one can argue that the entire opinion is *dicta.* Whatever the merits of that position, we believe it clear that *Ferdinand* represents the clear-cut position of the highest military Court on the matter of confrontation rights *vis-a-vis* the duty of the Government to press forward to secure

absent witnesses when the defense presses the issue.

4. The MOTION TO SUBMIT A DOCUMENT OUT OF TIME, dated 4 April 1990 is granted. Appellate counsel has forwarded the material citing *United States v. Grostefon,* 12 M.J. 431 (C.M.A.1982). We believe the better rule is to be liberal in permitting such submissions.